UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


MEGAN A. DISE                :        DOCKET NO.  2:12-cv-2341

VS.                          :        JUDGE MINALDI

U.S. COMMISSIONER OF SOCIAL  :        MAGISTRATE JUDGE KAY
SECURITY


## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of supplemental security income benefits.  This matter has been referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

After review of the entire administrative record and the briefs filed by the parties, this court recommends that the Commissioner's decision should be AFFIRMED and this matter DISMISSED with prejudice.

## PROCEDURAL HISTORY

Plaintiff began receiving supplemental security income benefits as a child with an onset date of December 1, 1994.  Tr. 22.  She was born on February 5, 1991, and when she turned 18, as required by law, her eligibility was re-determined based on the definition of disability used for adults.  Tr. 13-14.  On June 19, 2009, the Social Security Administration determined that plaintiff was no longer disabled and terminated her benefits as of June 1, 2009.  Tr. 22.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Tr. 56.  Plaintiff, who was represented by a non-attorney representative, appeared and testified at the

hearing on March 24, 2011, and at a supplemental hearing on August 3, 2011.  Tr. 288-317, 279-287.  Following the hearing the ALJ issued an unfavorable decision dated August 18, 2011.  Tr. 10-20.  In his decision, the ALJ applied the five-step sequential evaluation process and determined that plaintiff was not disabled under the Social Security Act.  *Id.*  The ALJ found at Step 5 that considering plaintiff's age, education, work experience, and residual functional capacity ("RFC") there are jobs that exist in significant number which plaintiff can perform.  Tr. 19.  Thus the ALJ determined that plaintiff was not disabled.  *Id.*

Plaintiff filed a request for appellate review of this decision and on July 9, 2012 her request was denied.  Tr. 5-7.  On September 10, 2012 plaintiff filed suit in this court appealing the determinations of the Commissioner.  Doc. 1.

# I.
# FACTS AND MEDICAL EVIDENCE

## A.  Facts

At the hearing on March 24, 2011, plaintiff was 20 years old.  Tr. 295.  She testified that she is unmarried and has a 4 year old child.  She lives with her mother and step-father.  She sdid not complete high school and does not have a GED.  She testified that she was attending classes in order to obtain her GED but did not complete them.  Her daughter is in school and, when asked what she does during the day, plaintiff replied, "nothing."  Tr. 299.  She testified that on a typical day gets her daughter ready for the school bus, goes back to sleep until 12:00 or 1:00 PM and then gets up to wait for her daughter to get back from school around 2:30 PM.  She makes her daughter an afternoon snack and helps with homework and plays with her after that.  Tr. 305.  She stated that she has tried to look for work but the only jobs available are fast food jobs and she does not think she can do this type of work because of her back pain.

Plaintiff stated that she would like to get her GED and get a veterinarian degree.  She stated that if she stands for over 30 minutes she has problems with the upper region of her back.  She also testified that when she was in driving classes her back started hurting after an hour of driving.  Plaintiff testified that her spine is not straight and she needs to continue to undergo physical therapy.  Plaintiff testified that she suffers from anxiety attacks, depression, crying spells, paranoia, and has problems getting along with co-workers.  On most nights she gets between 1-2 hours of sleep.  She stated that if she stood on her feet for two hours straight she would need some rest.

Plaintiff's mother, Melanie Joyce Dise, also testified at the hearing on March 24, 2011.  She stated that plaintiff is quick to anger, prone to violent outbursts, and physical violence.  Tr. 308-09.  She stated that plaintiff is not capable of taking care of her daughter without her assistance.  She testified that she is the one that gets the child up in the morning and gets her dressed and ready for school.  According to Ms. Dise, all plaintiff does in the morning is put her on the bus.  Ms. Dise stated that plaintiff does not cook, clean, or do any type of housework and she does not have friends.

At the supplemental hearing held on August 3, 2011[1], plaintiff testified that she was not working, had not looked for work, and was not attending school.  Tr. 282-83.  She testified that she has been very depressed.  She stated that she has been treating with Dr. Anthony Adeosun for the past two years.  He prescribed Lexapro to help her sleep, Valtrex for herpes, and Celexa for anxiety.  She testified that she was diagnosed with generalized anxiety disorder and has trouble breathing, worries a lot, exaggerates, and expects the worst.  She stated that she would not be able to hold down a job because the generalized anxiety disorder "takes over her entire

_____

[1] According to the ALJ the supplemental hearing was held because some medical records that were in an electronic file had not made their way into the record at the time of the first hearing.  He reset the hearing in order to properly admit the documents into evidence.  Tr. 281, 292-94.

life." Tr. 286.  She stated that she does not leave her house unless someone is with her because being out in public makes her paranoid.  Tr. 285-86.  She claimed at this hearing that she cannot take care of her daughter by herself because she does not have the patience and gets irritated with her.  Tr. 286.

### B.  Medical Evidence

#### 1.  Lake Charles Mental Health

The medical evidence from Lake Charles Mental Health indicates that plaintiff received outpatient there from January 31, 2006, through September 25, 2007 (age 15-16).  The medical notes state that she was seen by a therapist for anger management with the focus of the treatment on medication and compliance.  She was discharged on November 28, 2007, and the notes indicate that she had refused treatment.  Tr. 173.

#### 2.  Bernauer Clinic

Plaintiff was seen by Dr. R. Dale Bernauer on December 29, 2008.  In a letter written to Dr. Johnny Biddle, Dr. Bernauer explains that plaintiff has a history of scoliosis and surgery was performed at the age of 14.  At an office visit on December 29, 2008 plaintiff complained of neck and upper back pain.  Dr. Bernauer noted decreased range of motion in her neck and a normal neurological exam.  X rays showed some reverse lordosis and a good fusion and correction of the scoliosis.  Dr. Bernauer recommended an exercise program.  Tr. 113-14.  She returned to Dr. Bernauer on April 15, 2009 still complaining of neck and back pain without radiation.  Dr. Bernauer referred her to physical therapy.  Tr.  111-12.

A report dated October 1, 2009 and addressed to Dr. Bernauer from Lake Charles Memorial Team Therapy Rehabilitation notes that plaintiff attended 8 therapy sessions from

April 23, 2009, through June 18, 2009.  The report indicates that at her last visit plaintiff was pain free.  She did not attend or cancel her last two therapy sessions.  Tr. 236.

In a letter dated July 6, 2010, addressed to Dr. Anthony Adeosun, Dr. Bernauer reported that plaintiff was complaining of neck and thoracic spine pain.  He ordered an MRI and reported that she was attending physical therapy.  Tr. 107.

The results of the cervical spine MRI imaging dated July 14, 2010, show some reversal of the normal lordotic curvature which may be due to muscle spasm or patient positioning, postoperative changes upper thoracic region, and soft tissue prominence posterior nasopharynx. The thoracic spine imaging done the same date shows postoperative changes consistent with rod placement for scoliosis, and no disc pathology or abnormalities of the cord.  Tr. 105-06

On July 27, 2010 Dr. Bernauer referred plaintiff to physical therapy and on September 1, 2010, he noted that plaintiff was attending physical therapy with decreased pain.  Tr. 104, 103.

Progress notes from Primary Rehabilitation Services dated June 3, 2010, through July 7, 2010, report that patient continues to feel better with each physical therapy treatment.  At her final session plaintiff reported that she was doing a lot better overall since starting therapy.  She stated that her muscles were a little sore in her neck.  Tr. 134-37.

### 3.  *G. Jon Haag, Psy.D.*

At the request of the SSA, plaintiff was seen by G. Jon Haag, Psy.D. on May 22, 2009, for a psychological evaluation.  Plaintiff reported that she was not able to work because she had problems getting along with others.  The background information provided by plaintiff and her mother indicates that plaintiff has a history of bipolar disorder but is not currently receiving treatment and is not taking any psychotropic drugs because she feels she does not need them. She quit attending mental health sessions over a year ago.  She reported that she dropped out of

school in the 10th grade due to pregnancy and was attending adult education with one month left until she receives her GED.   Plaintiff's complaints include irritability, verbal aggression, throwing items, brief periods of depression, and poor relationships with authority figures.   She reported no work history and no use of alcohol or drugs.

Dr. Haag conducted a mental status exam and noted that plaintiff did not appear depressed, there was no evidence of acute mania, and she did not appear anxious.   Her memory and concentration were not impaired, she could perform two step mathematical problems and she could understand and follow simple instructions.   Her intellectual functioning was estimated to be average.   His diagnostic impression was Oppositional Defiant Disorder with a Global Assessment Functioning at 55.   He found that she was significantly impaired in social functioning and would need to find employment that minimized her interactions with others.   Tr. 209-11.

### 4.  Mark Boulos, M.D.

Dr. Boulos performed a psychiatric review technique on June 18, 2009.   He diagnosed plaintiff with depression, not otherwise specified, and oppositional defiant disorder.   He opined that she had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and determined that she experienced no episodes of decompression of extended duration.   Tr.  212-25.

On the same date Dr. Boulos completed a mental residual functional capacity assessment. He determined that plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions and was moderately limited in her ability to interact appropriately with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.   Dr. Boulos found no limitation in any other area.   He opined

that plaintiff retained the ability to understand, remember, and carry out simple instructions, make decisions, attend and concentrate for extended periods, appropriately interact with co-workers and supervisors and to adapt to routine changes in a work setting.  Tr.  226-29.

### 5. *Joseph Kahler, Ph.D.*

On October 21, 2009 Dr. Joseph Kahler reviewed and affirmed Dr. Boulos's opinion regarding plaintiff's psychiatric review technique and mental residual functional capacity.  Tr. 238-39.

### 6. *New Haven Family Medicine, Anthony Adeosun, M.D.*

Medical records from Dr. Adeosun indicate that plaintiff has been a patient of his since at least June 19, 2009.  From that date through July 26, 2010, the medical records indicate that plaintiff sought treatment for various ailments including suture removal, sore throat, congestion, acne, birth control, and herpes.

On February 25, 2010, plaintiff complained of anxiety and decreased sleep.  Dr. Adeosun's impression after the visit was insomnia and mood disorder.  He prescribed Lexapo. On May 25, 2010, plaintiff complained that the Lexapro was giving her bad headaches and she had neck and back pain.  Dr. Adeosun referred her to Dr. Beranuer for her back pain.  At a follow up visit on June 8, 2010, plaintiff indicated that physical therapy was helping with her back and medication was helping with her headaches.  At a visit on July 26, 2010, for acne and a birth control injection, plaintiff made no mention of any back pain or anxiety.  Tr.  115-129.

On August 2, 2011 in a letter addressed "To Whom it May Concern," Dr. Adeosun reported that plaintiff was under his care for generalized anxiety disorder and that she was prescribed Lexapro and Seroquel.  Tr.  278.

### 7. EAP Solutions

Plaintiff underwent an assessment at EAP Solutions on May 24, 2010. She complained of insomnia, crying spells, social withdrawal, irritability, and anger. She reported conflicts with a boyfriend and her step-father. The counselor's diagnostic impression was bipolar disorder. She gauged her global assessment functioning at 65.

### C. Other Evidence

#### 1. School Activity Report

A report submitted by Margaret Jackson, who was tutoring plaintiff in April of 2009, notes that plaintiff was working at the 12th grade level. She was having trouble with math and functioning at the 10th grade level in that subject. She noted that plaintiff is unorganized and has problems getting along with people. Ms. Jackson opined that plaintiff had a poor ability to remember information, adapt to new situations without getting upset, retain information from week to week, exhibit organization, and complete tasks on time. She had a below average ability to follow oral instructions, comprehend classroom discussion, express herself adequately, and initiate activities independently. She noted an average ability to make and keep friends and an above average ability to respond to praise and correction. Tr. 167-68.

Ms. Jackson, in a letter dated March 10, 2010 addressed "To Whom it May Concern," reported that plaintiff has expressed feelings of low self-esteem, anxiety and depression which she tries to hide by being defiant, rude and wanting things to go her way. She notes that plaintiff is very dependent on her mother for everything including raising her child. Tr. 170.

## II.
## STANDARD OF REVIEW

"In Social Security disability cases, 42 U.S.C. § 405(g) governs the standard of review." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citing *Frith v. Celebrezze*, 333 F.2d 557,

560 (5th Cir. 1964)).  The court's review of the ultimate decision of the Commissioner is limited to determining whether the administrative decision is supported by substantial evidence and whether the decision is free of legal error.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Greenspan*, 38 F.3d at 236).  "It is 'more than a mere scintilla and less than a preponderance.'"  *Id.*  (quoting *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002)).  It is "such relevant evidence as a reasonable mind might accept to support a conclusion.  It must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying the substantial evidence standard, the reviewing court critically inspects the record to determine whether such evidence is present, "but may not reweigh the evidence or substitute its judgment for the Commissioner's."  *Perez*, 415 F.3d at 461 (citing *Greenspan*, 38 F.3d at 236; *Masterson*, 309 F.3d at 272).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Conflicts of evidence are for the Commissioner, not the courts, to resolve."  *Perez*, 415 F.3d at 461 (citing *Masterson*, 309 F.3d at 272).

### III.
### LAW AND ANALYSIS

#### A.  *Burden of Proof*

The burden of proving that he or she suffers from a disability rests with the claimant. *Perez*, 415 F.3d at 461.  The Social Security Administration defines a "disability" as an "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting at least twelve months.  42 U.S.C. § 423(d)(1)(A).  The ALJ conducts a five-step sequential analysis to evaluate claims of disability, asking:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment[2]; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

*Id.* (citing 20 C.F.R. § 404.1520).  If the claimant meets the burden of proof on the first four steps, the burden shifts to the Commissioner on the fifth step to show that the claimant can perform other substantial work in the national economy.  *Id.*  "Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding."  *Id.* (quoting *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)).

The analysis ends if the Commissioner can determine whether the claimant is disabled at any step.  *Id.* (citing 20 C.F.R. § 404.1520(a)).  On the other hand, if the Commissioner cannot make that determination, he proceeds to the next step.  *Id.*  Before proceeding from step three to step four, the Commissioner assesses the claimant's residual functional capacity (RFC).  *Id.* "The claimant's RFC assessment is a determination of the most the claimant can still do despite

---

[2] A severe impairment or combination of impairments limits significantly a claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  Basic work activities are defined at 20 C.F.R. § 404.1521(b).  The term severe is given a *de minimis* definition as found in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).  According to *Stone*, "[a]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)).

If a severe impairment or combination of impairments is found at step two, the impairment or combined impact of the impairments will be considered throughout the disability determination process.  20 C.F.R. §§ 404.1520, 404.1523.  A determination that an impairment or combination of impairments is not severe will result in a social security determination that an individual is not disabled.  *Id.*

his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Id.* at 461-62 (citing 20 C.F.R. § 404.1545(a)(1)).   Specifically, in determining a claimant's RFC, an ALJ must consider all symptoms, including pain, and the extent to which these symptoms reasonably can be accepted as consistent with the objective medical evidence and other evidence.   20 C.F.R. § 404.1529; Social Security Ruling 96-8p.   The ALJ must also consider any medical opinions (statements from acceptable medical sources) that reflect judgments about the nature and severity of impairments and resulting limitations.   20 C.F.R. § 404.1527, Social Security Rulings 96-2p, 96-6p.   The claimant's RFC is considered twice in the sequential analysis—at the fourth step it is used to determine if the claimant can still do his or her past relevant work, and at the fifth step the RFC is used to determine whether the claimant can adjust to any other type of work.   *Perez*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1520(e)).

Here, the ALJ found that plaintiff was not disabled at Step 5 of the sequential analysis. The ALJ found that based on testimony from a vocational expert, plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers which plaintiff can perform.

### B. Plaintiff's Claims

In her appeal plaintiff argues that substantial evidence does not support the ALJ's decision.  Specifically, she sets forth the following arguments:

1. The ALJ failed to properly evaluate plaintiff's medically determinable physical and mental impairments in the aggregate pursuant to *Stone v. Heckler,* 752 F.2d 1099, 1101 (5th Cir. 1985).

2. The ALJ's RFC finding is not supported by substantial evidence.

3. The ALJ posited a defective hypothetical question to the vocational expert.

4. The ALJ misapplied grid rule 204.00 to deny benefits.

### C.  Analysis of Plaintiff's Claims:

**1.  Did the ALJ fail to properly evaluate plaintiff's impairments using the standard enunciated in the Fifth Circuit case of *Stone v. Heckler* ?**

Plaintiff submits that, although the medical evidence supports the presence of four medically determinable impairments (generalized anxiety disorder, depression, oppositional defiant disorder, and scoliosis), the ALJ, at the second step of the evaluation process, only found oppositional defiant disorder to be severe.  Plaintiff argues that the ALJ erred in failing to apply the non-severity standard found in *Stone* to her other three medically determinable impairments.

The Commissioner argues that substantial evidence supports the ALJ's step 2 finding. The Commissioner maintains that the ALJ considered each of plaintiff's impairments in his opinion but found that the medical evidence supported a finding that only the oppositional defiant disorder was severe under the standard in *Stone.*

Under 20 C.F.R. §§ 404.1520(c), 419.920(c), an impairment or combination of impairments is considered "not severe" if claimant's physical or mental ability to do basic work activities is not "significantly limited."   However, the Fifth Circuit has adopted a different standard for determining whether an impairment is severe.  In *Stone,* the Fifth Circuit held that an impairment can be considered as "not severe" only if it is a "slight abnormality" having such a minimal effect on an individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.  *Stone v. Heckler,* 752 F.2d at 1101 (emphasis added).  The Fifth Circuit stated in *Stone* that unless the correct standard was either set forth by reference or expressly stated in its opinion, it would assume the ALJ did not apply the correct standard.  *Id.* at 1106.

Subsequent to its decision in *Stone*, the Fifth Circuit published a decision holding that an ALJ's failure to follow the procedures set out in *Stone* does not automatically require remand

unless the claimant is harmed by the error.  *Taylor v.* Astrue, 706 F.3d 600, 603 (5th Cir. 2012).
Citing *Mays v. Bowen,* 837 F.2d 1362, 1364 (5th Cir.1988), the court noted that "procedural
perfection is not required unless it affects the substantial rights of a party."  Under *Taylor*, a
*Stone* error does not require remand but is instead subject to a harmless error analysis.  In *Taylor*
the court found substantial evidence supported the ALJ's finding that claimant's mental health
claims were not severe enough to prevent him from holding substantial gainful employment.
Thus, the court found "any error by the ALJ in not following the procedures set out in *Stone*
[wa]s harmless."  *Id.*

In this case, at Step 2 of the sequential analysis the ALJ found that plaintiff had the
severe impairment of oppositional defiant disorder.  Citing the *Stone* standard[3], the ALJ found
that plaintiff's impairment "imposes significant limitations on her ability to perform work-related
activities and is thus 'severe' within the meaning of the Social Security Act and Regulations."
Tr. 15.

While the ALJ may not have considered the three other medically determinable
impairments from which plaintiff claims she suffered at this particular step in the sequential
process, his opinion reflects that these impairments were considered in his overall assessment of
plaintiff's disability.  Finding that plaintiff suffered from at least one severe impairment, the ALJ
continued on to consider the remaining steps of the sequential process and, in doing so, discussed
the evidence relating to plaintiff's impairments, including those that were not specifically
mentioned at Step 2.

The ALJ addressed plaintiff's claim that she suffered from generalized anxiety disorder
as reported in a letter from Dr. Anthony Adeosun.  The ALJ stated that Dr. Adeosun's diagnosis

---

[3] The ALJ stated, "an impairment or combination of impairments is deemed 'non-severe' when it is no more than a
slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with
the individual's ability to work, irrespective of age, education, or work experience."  Tr. 15.

is unsupported by the record evidence.  Tr.  19.  The ALJ noted that Dr. Adeosun's "treatment records do not substantiate treatment for generalized anxiety disorder."  *Id.*  We agree.  The medical evidence submitted from Dr. Adeosun shows that on February 25, 2010, plaintiff complained of anxiety and decreased sleep.  Dr. Adeosun's impression after the visit was insomnia and mood disorder.  He prescribed Lexapo.  Subsequent records from Dr. Adeosun show that he continued to prescribe Lexapro but that plaintiff had no further complaints of anxiety.

As to plaintiff's claim of suffering from depression, the ALJ considered the opinion of Dr. Boulos who diagnosed plaintiff with depression (not otherwise specified) and oppositional defiant disorder.  The ALJ afforded substantial weight to Dr. Boulos' assessment noting that his opinion is "supported by the evidence of record."  Tr. 19.  However, Dr. Boulos opined that plaintiff's mental impairments (including depression) caused mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  Dr. Boulos opined that plaintiff retained the ability to understand and remember and carry out simple instructions, make decisions, attend and concentrate for extended periods, appropriately interact with co-workers and supervisors and to adapt to routine changes in a work setting. The ALJ did, in fact, rely on Dr. Boulos's assessment when he made his findings at Steps 2 and 3.

Finally, plaintiff claims that the ALJ failed to address her impairment of scoliosis.  The only medical evidence submitted that even mentions scoliosis is the MRI scan taken on July 14, 2010.  This scan shows postoperative changes consistent with rod placement for scoliosis, and no disc pathology or abnormalities of the cord.  Although plaintiff complained of back pain, the medical evidence does not relate the pain to scoliosis and records show that she was treated with

physical therapy and her progress notes indicate that she was getting better with each visit.  The most recent medical records from Dr. Adeosun do not indicate that plaintiff was complaining of any back pain.  Also of note is the fact that when describing her disabilities, plaintiff (and plaintiff's mother) consistently claimed she was disabled due to mental problems.  Tr. 33, 42, 78-84.  Scoliosis is not mentioned as a basis for her disability.

Because the ALJ considered all of plaintiff's alleged medically determinable impairments in his opinion, we find that any failure to make a particular finding that generalized anxiety disorder, depression, and scoliosis were non-severe at Step 2 of the sequential evaluation was harmless.

### 2.   Was the ALJ's RFC finding supported by substantial evidence?

Plaintiff argues that the ALJ erred when he failed to consider the opinions of several of her physicians when making his RFC determination.  Particularly, plaintiff claims that the ALJ "supplanted" his opinion for that of Dr. Knox, the radiologist who interpreted plaintiff's MRI and who identified the "impairment of scoliosis."  Doc. 12, p. 7.  Plaintiff argues that the ALJ "accorded no weight" to the opinion of Dr. Adeosun who reported plaintiff suffered from generalized anxiety disorder, and did not find Dr. Boulos's diagnosis of depression "severe."  *Id.* at p. 8.  Thus, plaintiff contends that the ALJ's RFC is not supported by substantial evidence.

The Commissioner asserts that the ALJ properly evaluated the medical opinions and explained the weight given to the physicians' opinions.  The Commissioner points out that it is the responsibility of the ALJ – not a physician – to determine plaintiff's RFC.  *See* 20 C.F.R. § 416.927(d), *Ripley v Chater,* 67 F.3d 552, 557 (5th Cir. 1995).  The ALJ is entitled to determine the credibility of medical experts and weigh their opinions accordingly; consequently, the

Commissioner concludes that the ALJ properly discounted the opinions of some of plaintiff's doctors and his RFC is supported by substantial evidence.

Here, the ALJ found that plaintiff retained the RFC to "perform a full range of work at all exertional levels but with the following non-exertional limitations: she must avoid concentrated interaction with the general public, coworkers, and supervisors." Tr. 16.  The ALJ explained that he considered all the opinions of record and specified:

> The opinion of the counselor the claimant sought treatment with at EAP Solutions is accorded no weight, as her impression appears to have been based solely on the subjective complaints of the claimant and the counselor is not qualified to render any medical diagnosis under the Act. The undersigned notes that Dr. Adeosun's diagnosis of Generalized Anxiety Disorder … is not supported by the evidence, as his treatment records do not substantiate treatment for Generalized Anxiety Disorder. The undersigned accords substantial weight to the assessments of the State agency medical consultants … as they are supported by the evidence of record.  In sum, the above residual functional capacity assessment is supported by a preponderance of the evidence.

Tr. 19.

We find no basis for plaintiff's contention that the ALJ "supplanted" his opinion with that of Dr. Knox.  As stated above, the MRI scan of plaintiff's spine revealed evidence of scoliosis rod placement.  The MRI further revealed that plaintiff had no disc pathology or abnormalities of the cord.  As noted by the Commissioner, plaintiff fails to demonstrate how a "diagnosis" of scoliosis translates into a functional limitation.  There is no evidence of record to support plaintiff's contention that she may be functionally limited by her scoliosis.

Likewise, plaintiff's assertion that the ALJ did not find Dr. Boulos's diagnosis of depression "severe" is misplaced.  While the ALJ must consider both "severe" and "non-severe" limitations when making his RFC determination, a finding of severe or non-severe is a function at Step 2 of the sequential analysis.  An RFC determination is assessed at Step 4.  Further, as

stated above, an RFC is a determination of plaintiff's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  A diagnosis of depression does not translate into a functional limitation.  What the ALJ properly relied on was Dr. Boulos's limitations he assessed in the psychiatric review technique and the mental residual functional capacity assessment.   Specifically, Dr. Boulos found that plaintiff's mental impairments (including depression) resulted in mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace and that she maintained the RFC to understand, remember, and carry out simple instructions, make decisions, attend and concentrate for extended periods, appropriately interact with co-workers and supervisors and to adapt to routine changes in a work setting.

Finally, plaintiff's assertion that the ALJ erred in affording no weight to the opinion of Dr. Adeosun is unpersuasive.  We explained above that the ALJ found that Dr. Adeosun's diagnosis of generalized anxiety disorder was not supported by his treatment notes; furthermore, Dr. Adeosun never gave any opinion as to whether or not plaintiff's anxiety disorder resulted in any functional limitation.  The opinion of a treating physician may be rejected by the ALJ when the evidence supports a contrary conclusion and may be assigned little or no weight when good cause is shown.  *Newton v. Apfel,* 209 F.3d 448, 455-56 (5thCir. 2000).  Good cause exists when the physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *Id.*

After considering the record as a whole, we find that the ALJ's RFC is supported by substantial evidence.

### 3.   Did the ALJ ask the vocational expert a defective question?

Plaintiff argues that the ALJ erred by (1) failing to include plaintiff's impairments of

scoliosis and depression in his hypothetical question to the vocational expert ("VE"); (2) failing to include the impairment of "moderate difficulties in maintaining concentration, persistence and pace" from Dr. Boulos' psychiatric review technique; and (3) asking the VE a question that assumed the hypothetical individual should avoid "concentrated exposure" rather than "minimal interactions" with co-workers, supervisors and the general public.

The Commissioner maintains that the ALJ's questions to the VE accounted for all of plaintiff's severe impairments by incorporating them into his RFC finding.  By including all of the limitations and disabilities recognized by the ALJ, the Commissioner submits the questions were proper.  The Commissioner further asserts that each job listing provided by the VE in response to the ALJ's questions is classified as a specific vocational preparation level 2 which corresponds to unskilled work dealing primarily with objects rather than people.  Therefore, the Commissioner submits that the hypothetical question posed using the term "concentrated exposure" rather than "minimal interactions" is of little significance and reversal is not required.

In *Bowling v. Shalala*, 36 F.3d 431 (5th Cir.1994), the Fifth Circuit determined that:

> Unless the hypothetical question posed to the vocational expert by the ALJ can be said to reasonably incorporate all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the questions), a determination of non-disability based on a such defective question cannot stand.

*Id.* at 436.

In this case, the ALJ asked the following questions of the VE:

> Q:    I'd like you to assume a younger individual with the same educational background and no work history as [plaintiff] has.  If I were to find that individual had no exertional limitations and had the following non-exertional limitations; the individual is

able to understand, remember, and carry out simple instructions; make decisions, attend and concentrate for extended periods; and must avoid concentrated exposure to co-workers and supervisors and the general public.  With those limitations, could you identify any occupations such an individual could perform?

A:    Clarification, your Honor.   On the avoiding concentrated exposure to co-workers, supervisors, and general public, can these people be around her, or is it the interaction that's --

Q:    It's the interaction.

A:    Thank you.  So basically, working more with people – things versus people and --

Q:    Yes.

A:    Okay.  Hand packager; medium; unskilled; SVP2; DOT 920.587-018.  State economy, approximately 1, 050 similar jobs; national economy, approximately 162,885 similar jobs.

      Cook helper; medium; unskilled; SVP 2; DOT 317.687-010.  State economy, approximately 3,945 similar jobs; national economy, approximately 171,645 similar jobs.

      Kitchen helper; sedentary; unskilled – excuse me – medium; unskilled; SVP 2; DOT 318.687-010.    State economy, approximately 3.435 similar jobs; national economy approximately 277, 150 similar jobs.

Tr. 314-15.  Following questioning by the ALJ, plaintiff's non-attorney representative was given the opportunity to cross examine the VE; however, she declined to ask the VE any questions. Tr. 315-16.

       Plaintiff contends that the ALJ's question was defective because it failed to include her impairments of scoliosis and depression.  As addressed in the arguments above we find the ALJ's explanations for not including scoliosis and depression well-reasoned and supported by substantial evidence.  We find that the ALJ's hypothetical to the ALJ necessarily takes into account all of plaintiff's severe impairments recognized by the ALJ.

Plaintiff's assertion that the hypothetical was defective because it failed to include her impairment of "moderate difficulties in maintaining concentration, persistence and pace" from Dr. Boulos' psychiatric review technique is also without merit.  The limitations plaintiff is referring to above are taken from Dr. Boulos' psychiatric review technique.  As noted by the Commissioner, the purpose of this evaluation is to determine the severity of the mental impairment and whether it meets a listing at Step 3.  When the impairment does not meet a listing, the medical consultant will go on to assess the claimant's RFC.  *See* 20 C.F.R. §§ 416.920a(d)(1), (2), (3).  In his mental RFC evaluation Dr. Boulos opined that that plaintiff retained the ability to understand, remember, and carry out simple instructions, make decisions, attend and concentrate for extended periods, appropriately interact with co-workers and supervisors and to adapt to routine changes in a work setting.  The ALJ relied on Dr. Boulos's RFC when questioning the VE except for the fact that he limited plaintiff's exposure so that she "must avoid concentrated exposure to co-workers and supervisors and the general public."  We see no error in the hypothetical question.

Next, plaintiff's argument that the ALJ should have used the term "minimal interactions" rather than "concentrated exposure" to others is unpersuasive.  Plaintiff argues that the term "concentrated exposure" is ambiguous and unsupported by the record.  As noted above in the colloquy between the ALJ and the VE, the VE asked for an explanation and the ALJ clarified noting that it was the interaction with others that plaintiff must avoid.  Furthermore, each job listing given by the VE in response to the ALJ's hypothetical is an unskilled job which does not require significant interactions with others.

As is apparent from above, the hypothetical question posited to the vocational expert in this case was not defective as the question reasonably incorporated all of the limitations

recognized by the ALJ.  The ALJ here asked the vocational expert a hypothetical question that included the RFC that he found was supported by the record.  Further, plaintiff's non-attorney representative was given the opportunity to cross-examine the vocational expert and suggest any defects in the hypothetical question.  We therefore find this argument without merit.

**4.   Did the ALJ misapply grid rule 204.00 to deny benefits?**

Plaintiff argues that at Step 5 of the sequential evaluation the ALJ misapplied grid rule 204.00 to deny benefits.  The Commissioner maintains that, although the ALJ refers to grid rule 204.00 is in his opinion, a review of the entire opinion shows that the ALJ relied on vocational testimony – not the grid rules – in order to find that plaintiff was not disabled.

We agree with the Commissioner.  In the very last sentence of his opinion the ALJ stated, "[a] finding of 'not disabled' is therefore appropriate under the framework of section 204.00 in the Medical Vocational Guidelines."  Tr. 20.  This is clearly a typographical error.  The ALJ begins the paragraph with this statement, "[b]ased on the testimony of the vocational expert, the undersigned concludes that, since June 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  *Id.*

We find that the ALJ did not rely on the grid rules when making his determination and reversal is not required based on a clerical error.

## IV.
## CONCLUSION

Based on the foregoing, we find substantial evidence of record and relevant legal precedent support the ALJ's decision that plaintiff is not disabled.   It is therefore RECOMMENDED that the ALJ's decision be AFFIRMED and this matter be DISMISSED with prejudice.

-21-

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

THUS DONE this 24th day of November, 2014.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE